# D. STATEMENT OF CLAIMS

## Introduction

1.     Jessica Richey, ("Richey"), Chris Downard and Granicus LLC ("Granicus"), collectively ("Defendants"), hired Plaintiff, Tiffany Grays ("Plaintiff") as one of its Product Owners. Plaintiff began her employment on January 2, 2018, and her employment was terminated on March 20, 2018, after enduring the long rigorous two month hiring process consisting of many interviews and assessments. Defendants actions have unlawful and unethically disparately impacted and treated Ms. Tiffany Grays. Exhibits Attached to Original Complaint are referenced herein and to be used herein.

2.     During Plaintiffs' short seventy-seven days of employment, the Plaintiff encountered and endured many acts of disparate treatment sustained by and through the will and decisions of her direct boss, Mrs. Richey.  Defendants also disparately impact the African-American community by employing hiring practices which alienate opportunities for the African-American community. Additionally, Defendants disparately impact the Plaintiff by deploying a merit system which unfairly assessed the performance of the only African-American on the team of more than 20 and failing to provide adequate training. Granicus employees Richey and Chris Downard ("Downard") then conspire to commit the unlawful act of depriving the Plaintiff of lawful right to equal employment and equal protection. The Glass Ceiling Act of 1991, Sec. 202[1], appropriately recounts the practices incorporated within Granicus, as Ms. Grays was the only African-American woman to be hired at her management position or higher within the company for the last 3 years, a stunning achievement.

## Jurisdiction & Venue

3.     Plaintiff brings this action under the Constitution and laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 1981 and 42 U.S.C. § 2000e. et seq. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

4.     Claims for relief that are based on the Colorado Constitution, have the same nucleus of operative facts and are so related to the federal-law claims that they form part of the same case or controversy. This Court has jurisdiction over the supplemental state-law claims pursuant to 28 U.S.C. § 1367.

---

[1] The Glass Ceiling Act of 1991states in relevant part. (a) "[F]INDINGS- Congress finds that--
(1) despite a dramatically growing presence in the workplace, women and minorities remain underrepresented in management and decision making positions in business;
(2) artificial barriers exist to the advancement of women and minorities in the workplace;"

5.     This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201, 2202.

6.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). The Defendant is a registered business within the District of Colorado, and all relevant events occurred and will occur in the District of Colorado.

## Parties

7.     Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. Plaintiff Tiffany Grays is a resident of Aurora, CO, Denver Colorado Native, and was a full-time employee with Granicus. During her employment, she worked at the Denver, Colorado office. Plaintiff has worked in Information Technology ("IT") for over 12 years. Holds a Bachelor's Degree in Information Security Systems from ITT Technical institute where she graduated with honors. Plaintiff is currently a registered Certified Scrum Master, SCRUM Alliance License # 501762. Plaintiff has managed several projects and products for multiple companies in the Denver Metro Area. Plaintiff filed the charge[2] of discrimination with the Equal Employment Opportunity Commission on May 17, 2018 and received the Dismissal[3] on June 02, 2018, dated May 23, 2018.

8.     Defendant Granicus LLC is a Foreign Limited Liability Company, with headquarters located at 707 17th St. Ste. 4000, Denver, CO 80203. Granicus at the time of Ms. Grays employment held between 201 – 500 employees.

9.     Defendant Jessica Richey was the Program Manager at the time of the Plaintiffs' employment. Richey is located in the St. Paul Minnesota office, located at, 408 St Peter St Suite 600, St Paul, MN 55102. Richey was the direct boss of the Plaintiff and had a duty to guide, train and direct the Plaintiff as well as held not authority over the Plaintiff according to the position, and organizational chart[5]. Richey will be named individually and in her professional capacity.

10.    Defendant Chris Downard ("Downard"), Director of Software Engineering, at the time of the Plaintiffs' employment and worked at company headquarters located at 707 17th St. Ste. 4000, Denver, CO 80203. As the Directory of Software Engineering, Downard was ultimately responsible for the developers on the team to which the Plaintiff was the Product Owner, and Scrum Master. Downard held not authority over the Plaintiff according to the position, and organizational chart[5]. Downard will be named individually and in his professional capacity.

---

[2] Exhibit 1
[3] Exhibit 2
[5] Exhibit 4

# Background

11.———_____ Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. Plaintiff applied for position #460269, on October 31, 2017. Position #460269, Product Owner, Denver, CO, lists the following as attributes sought by Granicus and the performing requirements[4].

### 1. Job Description

'[G]ranicus is seeking a skilled product owner to join our engineering team – creating great tools that help transform the citizen experience. The Product Owner is responsible gathering business requirements from cross-functional stakeholders, then guiding the vision of what needs to be built and conveying that vision to their agile team and business partners. You will help define acceptance criteria for stories and validate they are met. You will effectively manage the product backlog, delivering a prioritized set of stories for the product. As the Product Owner, you are responsible for delivering roadmap concepts and maintaining the products."

### 2. Position Responsibilities

"[A]ct as the agile product owner and scrum master

Own and prioritize the backlog for a feature area in collaboration with the Product Manager

Prioritize tradeoffs, clarify requirements and work to drive user stories to acceptance throughout the agile development lifecycle

Participate in sprint planning, review, and retrospective meetings and providing feedback to the team

Ensure acceptance criteria are clearly defined and verify that story implementation matches requirements

Maintain constant communication with the team

Enable internal teams to support product."

---

[4] Exhibit 3

3. **Position Requirements**

"[3]+ years of experience working with technical teams, or equivalent industry certifications/experience in product development/management method

Experience with and passion for agile development

Ability to flex between the technical and business sides of your brain – engineers and cross-functional team members alike love to work with you

Relentless commitment to prioritization

Strong analytical skills and ability to work both independently and lead cross-functional teams

Ability to build strong working relationships across all levels of the organization, including remote areas

Ability to function well in a fast-paced, dynamic environment with competing priorities

Ability to prioritize product capabilities/features based on vision, business goals, technology, schedules, and budgets

Ability to influence without authority and champion change when needed

Detective-like problem-solving skills – you thoroughly investigate the situation and then use that data to design the right solution

Passion for customers and good user experience

Bachelor's degree – IT, Computer Science, Business or related field."

4. **Equal Opportunity Statement**

"[G]ranicus is committed to providing equal employment opportunities without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status."

**Organizational Information**

12.     Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. The organizational chart[5]which communicates an inadequacy of minority presence within the organization. At the time of Ms. Grays' employment, there were roughly 240 employees and of those 240, only 15 were African American. That's about 7% of the employee population being African American. While non-Caucasian employee counts rise to a mere 24, or 10% of the employee population. When we look at the position level that Ms. Grays sat, the statistics are much more grim. Of the 29 individuals at or above the position level of Ms. Grays, there are no other, that's correct, 0, African-Americans, and only 2 non-Caucasian individuals. The specific office in which Ms. Grays worked, employed only 2 other African-Americans, out of more than 50 employees. Ms. Grays' position level is on page three of the organizational chart[5]. Statistics cannot be ignored and purport Plaintiffs' claims of disparate impact and treatment[7].

**Hiring Process**

13.     Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. Granicus deploys a stringent hiring process which is quite lengthy. On November 08, 2018, Recruiter Sean Spooner, ("Spooner"), contacts the Plaintiff via email to setup a, "[q]uick 5-10-minute phone conversation to kick off the interview process." Ms. Mariah Leiferman, Office Administrator in St. Paul Minnesota, responds to Spooners' email to the Plaintiff and sets up the phone interview for November 09, 2018.

14.     The phone interview is successful and on the same day, Ms. Leiferman sends the Plaintiff the first of many assessments[6]. The Plaintiff successfully completes the assessment which consists of two tests. A phone interview was scheduled for November 15, 2017, by Spooner who states, "[t]he Manager has reviewed your results & would like Ms. Grays to schedule a 30-45 minute phone interview between the two of us."

15.     After successfully completing the two assessments, online application, and phone interview, Spooner emails the Plaintiff to advise the Manager, Jessica Richey, would like to schedule a Video Conferencing Interview. The Plaintiff schedules an impromptu interview after multiple reschedules, on November 20, 2018.

16.     Plaintiff is sent the following message from Spooner on November 21, 2018, "[Plaintiff]t sounds like things went well with Richey yesterday. She wanted Ms. Grays to send along the follow up exercise she explained to you. Please let Ms. Grays know if you have any questions. Otherwise, we'll plan on the next interview sometime next week. Let Ms. Grays know your availability." Plaintiff completes these two exercises and sets up another Video Conferencing interview, this time it is scheduled to last two hours.

---

[6] Exhibit 5

[7] Plaintiff excluded personnel from CA, noted in the legend at the color purple, as these were part of an acquisition right before the Plaintiff was unjustly terminated, pages 39—44.

5

17.     On Monday December 04, 2018, Spooner sends the Plaintiff another assessment to take, "[b]elow is the information you will need to take the Validation CCAT Test." Additionally Spooner schedules the first on-site interview for December 06, 2017, with Chris Downard. A Video Conferencing interview is setup for December 07th with Thomas Hernancz. After completing both these steps, Plaintiff is setup for the second and final interview, in-person for December 14, 2017. Spooner asks for Plaintiffs' references immediately preceding the interview. ~~Per Spooners' comments later, the references provided were great. Spooner offers the position on December 15th, and gives the Plaintiff until the 18th to respond.~~

---

[6] Exhibit 5
[7] Plaintiff excluded personnel from CA, noted in the legend at the color purple, as these were part of an acquisition right before the Plaintiff was unjustly terminated, pages 39 – 44.

Per Spooners' comments later, the references provided were great. Spooner offers the position on December 15th, and gives the Plaintiff until the 18th to respond.

 18.     Plaintiff clarifies benefits with Spooner, as Granicus provided different terms in the documentation, then what is allowed. Plaintiff sends Spooner a 3-paged signed Employee Rights and Covenants Agreement, ("ERCA"), and signed offer letter on December 18, 2018, via email. Spooner accepts the new contract terms offered by the Plaintiff.

## Statement of Facts

### Human Resources Sub-Par Performance Accepted by Granicus

19.     Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. Prior to the plaintiff's start date, she noticed the HR departments propensity to poor communication. Unfortunately, within the first few days, the plaintiff learned she was not the only one with this mindset. As a part of office public policy joking, realistically, regarding the frustrating untimely behavior of the HR department, which many have become accustomed. This same behavior that is exhibited throughout the statement of facts.

20.     Granicus's laisser-faire approach to ensuring proper performance, allowed the plaintiff to dictate the terms upon which she was employed.

21.     During the plaintiffs' short seventy-seven days of employment at Granicus, LLC, in Denver, Colorado, multiple people in the Human Resources department failed to notice, the plaintiff refused the terms in their Employee and Restrictive Covenants Agreement.

22.     The following people personally assisted in the plaintiff's hiring: Carrie Cisek, Vice President of Human Resources ("HR"); Jen Poulsen, HR Manager; Jaidyn Martin, HR Manager ("Jaidyn"); Mariah Leiferman, Office Administrator; Breanna Hadley, Office Administrator and Sean Spooner, Recruiter HR, ("Sean").

23.     Granicus has authorized all four aforementioned individuals within HR above, whom are and/or were employed in the HR department, at Granicus, at the time of the plaintiffs' employment, authority to act as authorized agents on behalf of Granicus.

24.     Carrie Cisek, Sean Spooner & Jaidyn Martin held the authority to modify employment offers behalf of Granicus.

25.     Carrie Cisek, Sean Spooner & Jaidyn Martin held the authority extend and to deny or rescind employment offers behalf of Granicus.

26.     The original, blank ERCA was received by the plaintiff, via email, on 12/15/2017 and contains sixteen pages in total. Sean sent the ERCA along with specific instructions, which the plaintiff intentionally did not adhere to.

27.     Sean's email stated the following:

"[H]i Tiffany,

        I'm delighted to extend you an offer to join the Granicus Team as a Product Owner.  Attached is the offer letter outlining the terms & the Restrictive Covenant Agreement as well. Regarding the Restrictive Covenant Agreement, the Effective Date on the 1st page would be your start date, in your case 01/02/2018. There is a place you need to initial on Page 12, otherwise where you need to sign and any other information you would need to fill in is pretty straight forward. If you have any questions, please don't hesitate to email or call Ms. Grays. Please sign & scan in the full offer & restrictive covenant agreement & email them back to Ms. Grays as PDF attachments at your earliest convenience."

28.     Sean Spooner accepted the ERCA, incomplete, on behalf of Granicus. All the while it contained the following discrepancies:

A. The ERCA effective date is incorrectly the date of signing. Per instructions, the effective date should have been the employee start date, 01/02/2018.
B. The plaintiff only scans, signs and sends the following:
    i. page sixteen: Schedule 1 -  Prior Inventions, initialed and signed
    ii. page fifteen: *unknown/no name*, signed
    iii. page one: ERCA, dated and named

29.     Specifically, Sean overlooked four errors, contained within the ERCA: (1) incorrect effective date, (2) incorrect number of pages, (3) missing arbitration signature and (4) missing arbitration initials.

30.     Specifically, Jaidyn Martin missed five errors within the ERCA: (1) the ERCA is unsigned by the plaintiff, (2) incorrect effective date, (3) incorrect number of pages, (4) missing arbitration signature and (5) missing arbitration initials.

31.     Ultimately, as the VP of HR, Carrie Cisek is responsible for making sure the documents are signed and HR employees are adhering to the duties in their jobs properly, Carrie was also negligent in her duty.

32.     The plaintiff printed, signed and scanned the following pages from the ERCA on 12/18/2017: (1) page one: ERCA, dated and named, (2) page fifteen: *unknown*, signed and (3) page sixteen: Schedule 1 - Prior Inventions, initialed and signed. These were emailed to Sean.

33.     The plaintiff agreed to the terms contained within the first page of the ERCA only, when she scanned and emailed the three-page ERCA to Sean. Sean accepted the plaintiffs' new offer, thereby, at that time, she was held to these three terms only: (1) Purpose (of ERCA), (2) The Business of the Company and (3) "At Will" Employment of Employee.

34.     On 01/01/2018, the plaintiff asked her mother to print the ERCA, her mother complied. The plaintiff picked up the sixteen-page, newly printed, ERCA, on her way to work. The plaintiff intentionally and consciously decided not to sign or initial the arbitration or employee signature portions of the ERCA.

35.     The plaintiff placed the sixteen-page ERCA into an envelope and sealed it, on her way to work, her first day, as instructed per Mariah Leiferman, Office Administrator at Granicus and Sean Spooner.

36.     This ERCA was allegedly mailed to HR, in a sealed envelope by the Denver Office Administrator, Breanna Hadley, on or about 01/02/2018, after the plaintiffs' employment commenced. Once received, HR then allegedly scanned the document into their system.

37.     The version scanned into HR's system and the version provided to Breanna Hadley, by the plaintiff, would be the same document, expect for a missing scanned page.

38.     At the plaintiffs' termination on 03/20/2018, Jaidyn Martin provided the plaintiff, via email, an errored scanned version of her ERCA, the one she gave to the Denver Office Administrator, in the sealed envelope.

39.     This err went unnoticed by Jaidyn and HR superiors, as they provided this incomplete, inaccurate, and thus ineffective document to the plaintiff, at her termination, as if it were a true, valid, and enforceable ERCA.

40.     To repeat, the plaintiff placed the sixteen-page ERCA into the envelope and sealed it. The ERCA received by the plaintiff from Jaidyn, post termination, contains only fifteen pages in total, the ERCA is incomplete.

41.     The discrepancy comes after page thirteen, at the Governing Law and Forum Selection: "[T]his Agreement shall be governed by and construed in accordance with the Federal Arbitration Act. Any non-arbitration-covered disputes shall be resolved under the substantive laws and in the jurisdiction of the state where Employee most recently worked for the Company."

42.     Carrie Cisek, Sean Spooner and Jaidyn Martin all came into contact with the ERCA and at no point during the plaintiff's seventy-seven days of employment, did anyone notice that these covenants were not agreed to. Nor did anyone in HR notice that the plaintiff may not be aware of her rights.

43.     Three separate documents were included in the email sent by Jaidyn, at termination, which the plaintiff received on 03/20/2018: (1) the ERCA (fifteen pages); (2) separation letter (severance package) and (3) release.

44.     The documents contained within the email sent by Jaidyn, at termination, were meant to be the final documents sent to the plaintiff; no further documents regarding separation, severance, release or ERCA were expected to be sent to the plaintiff.

45.     The ERCA the plaintiff received on 03/20/2018 did not have a signature on: (1) the arbitration agreement, (2) arbitration initials and (3) the signature area for the entire ERCA. The plaintiff is only able validate this part of the ERCA as true; the one placed in the sealed envelope, as they are unsigned, barring missing page fourteen and it is her handwriting.

46.     The ERCA the plaintiff received on 03/20/2018 has the plaintiffs' name and signing date on the first page, in her handwriting; and only contains the plaintiffs' signature on page 16, Schedule 1 – Prior Inventions.

47.     Granicus failed to sign the ERCA, although the 03/20/2018 ERCA resides in the defendants' physical possession.

48.     On 03/26/2018 the plaintiff sends an email to Jaidyn, HR manager and requests a copy of her employee file, pursuant to C.R.S. § 8-2-129. Jaidyn responds to other questions via email, but ignores this request for twenty-four hours, before Carrie Cisek, the V.P. of HR responds and says, "[W]e are working on pulling together that information and will have it to you as soon as it is ready."

49.     Seventeen calendar days from termination and twelve calendar days from date of request elapse, before the defendant provides the plaintiff her employee file. Within said file lies a completely different version of the ERCA, then what was originally provided to the plaintiff at termination. This was only provided to the plaintiff, per her request of her employee file in pursuant of C.R.S. § 8-2-129.

50.     Carrie Cisek, the VP of HR, refused three separate occasions to verify the date the contents of the employee file were created and the date the contents were added to the file.

51.     The second version of the ERCA received on 04/06/2018, is the version the plaintiff originally scanned and emailed to Sean on 12/18/2017, the three-page ERCA.

52.     The defendant realized the ERCA Jaidyn provided to the plaintiff at termination, was not signed, therefore invalid, and wanted to proffer a different version as the ERCA between the defendant and the plaintiff.

53.     The ERCA's have different date types. The date written at the top of ERCA received on 03/20/2018 states, "12-18-17," the ERCA received on 04/06/2018 is dated, "December 18, 2017," therefore indicating two different documents.

54.     Granicus failed to sign the 04/06/2018 three-page version of the ERCA, which Granicus only retains electronically.

55.     Granicus requires the full, sixteen (16) page, ERCA, to be in their physical presence, signed in all applicable areas, in order to satisfy the steps required to complete the agreement between employees and the defendants.

56.     Missing page fourteen of the ERCA, contains verbiage for the section: Governing Law and Forum Selection; this page was not included in the ERCA version sent 03/20/2018 or 04/06/2018, which would be a benefit to the plaintiff, as she is not bound to arbitration.

57.     Pages of the employee file were added hours before the file was sent to the plaintiff.

58.     Every member in the HR department has a contractual obligation to perform the job assigned, as well as, "[h]ave the best interest of the company, at all times;" according to the ERCA. Not only ignoring the duty in the role but to the ERCA. This obligation also extends to the employee, which no one fulfilled their duty.

**Working Conditions**

59.     Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. During Plaintiffs' first week of employment Plaintiff was met with many different people upwards of fifteen, came up to Ms. Grays and told Ms. Grays how much they were so glad that Plaintiff was here. Tthis communicated a need for Plaintiffs' position as the product was in a dire state.

60.     Plaintiffs' first day, along with Caucasian Counter-Part Heather Hobbs, was setting up Plaintiffs' computer, meeting with the team and a meeting with Plaintiffs' boss Jessica Richey.  Thirty30 minutes after Plaintiff arrived on Plaintiffs' first day the first meeting with Plaintiffs' development team took place. The development team has a stand-up meeting every work day at 9:30 a.m. Mountain Time. Plaintiff sat in on the meeting. Plaintiff heard and saw the level of work and problems that existed immediately. The tone and demeanor of Bill Jones in the meeting was controlling, unprofessional, he did not appreciate others opinions and he did not respect them as he consistently over talked everyone. Plaintiff noted this issue in Plaintiffs' meeting with Richey that day. Richey indicated she was aware of the issue. Richey works out of the Michigan office, and was only in town because it was Plaintiffs' first day and another product owner, Heather Hobbs' first day. The meeting with Richey and Heather, she discussed high level objectives for our positions, however she indicated that Plaintiffs' product and Plaintiffs' level of work was going to be significantly more than Heather's, due to the current status of Plaintiffs' product. Richey Indicated to Ms. Grays that she was unclear on what would be required on Plaintiffs' product as Plaintiffs' product have been functioning outside of Management's purview for years.

61.    Plaintiffs' second day of work Plaintiff was confronted with a conversation from Nick Harris, ("Harris"), an executive asking for " something, anything." Harris was asking for something, was because he was tasked by Mark Haynes, the CEO, to determine what needs to be done on this product, how to save our customers and to push this product forward. This discussion which was initiated by Harris right in front of Plaintiffs' desk involved Plaintiffs'self Harris Downard and Richey. Neither Downard nor Richey could give Harris the answer he sought. Harris and Plaintiff both realized at that time, that there was going to be a lot of work to get this product to where it needed to be.

62.    As Plaintiffs' first week ended Plaintiff realized that the QA engineer, who was acting as scrum master, but in a very ineffective way, no longer needed to do so. In Plaintiffs' conversation with Downard he advised if Plaintiff felt that it would be better for Ms. Grays to take that role, then to do so. Plaintiff had a meeting with Nam to discuss Ms. Grays taking this role, he believed that that would be a good idea and so we made that announcement to the rest of the team.

63.    Plaintiffs' first week ended with a clear understanding that there was no clear path or insight into what was going on with this product and what we needed to do to remedy issues. Richey confirmed with Ms. Grays before heading back to the St. Paul office, that Plaintiff was on the right track and she had no concerns or suggestions.  Plaintiff was able to make connections with Plaintiffs' development team as well as other co-workers in the office. Plaintiff knew it would be a lot of work required to get this product functioning in order.

64.    Plaintiffs' second week was drastically different from the first week. Plaintiff started the week acting a scrum master. One of the objectives was very clear was that Plaintiff needed to build team cohesiveness and bridge the gap between the Denver office and the Virginia office. As m role was both Scrum Master and product owner,  Plaintiff asked the team to make a few changes. Plaintiff wanted to have the team meet on video. Bill Jones, ("Bill") declared that he was not going to participate. This was done in front of all other team members. This caused Ms. Grays to respond, which ensued a back and forth between Bill and Plaintiff. Immediately after this meeting Plaintiff notified Downard the director of engineering to discuss the issue. He advised that Bill is " just this way,"  but that he would speak to him. 2 Days Later, the same situation happened in regards to some other processes Plaintiff attempted to initiate. Plaintiff again notified Downard and he again said that he would talk to him.

65.    Plaintiff not only faced this kind of unprofessional conduct from Bill but also from Brian Bolig, ("Brian") as Plaintiff had created some documents and presentation Plaintiff needed all of the team to have access to those and Plaintiff sent the links out on Slack Plaintiff used "@channel".  Brian, who was on PTO at the time, sent Ms. Grays a message in Slack, explaining to Ms. Grays how to use the proper signals in Slack.  Plaintiff replied to him and said that Plaintiff intended on using what Plaintiff used and that if he did not want to receive notifications while he was on PTO, that he should sign out of the application or turn snooze on. He did not like Plaintiffs' response and notified Richey.  She then brought this to Plaintiffs' attention during our weekly meeting. When Richey brought this to Plaintiffs' attention, Plaintiff was baffled by

the ridiculousness of the issue. By this time Plaintiff had already experienced the blatant disrespect and insubordination received from Bill, but now Plaintiff is being confronted with ridiculousness on how Plaintiff chooses to notify Plaintiffs' development team of important information in our private channel. Plaintiff informed Richey that he can snooze the notifications. Richey said that it is not possible for him to snooze the notifications if Plaintiff use @channel and also said that Plaintiff was "not fitting into the culture." After this meeting, Plaintiff looked and saw that it was possible to turn off these notifications. Plaintiff Richey a screenshot of this and she never replied.

66.     Not only was all of this happening the second week, but Plaintiff also began to have conflict with Matt McFarland, Product Manager, remotely located. Matt McFarland ("Matt"). During Plaintiffs' first week Plaintiff asked for clarification on what his role is and what Plaintiffs' role is. Plaintiff was told by Richey that the product manager is the "[w]hat," and the product owner is the "[h]ow." As the second week continued, Matt continued to over step into Plaintiffs' role which Plaintiff made Richey aware. Plaintiff also was questioned by other people as to why Plaintiff was asking questions or in meetings or questioning Plaintiff performing the job duties as outlined. This caused Ms. Grays to ask upper management for clarification of our roles. Plaintiff sent an email to Harris, Downard, Laurel Anderson ("Laurel"), and Richey, outlining what Plaintiff believed Plaintiffs' role to be. This was something that Plaintiff had clarified the day before with Downard for the engineering team. This was needed as the engineering did not understand Plaintiffs' role. It was imperative for the productivity in Plaintiffs' role that everyone be clear on what Plaintiff was expected to do. Plaintiff sent the email, outlining what Plaintiff observed Plaintiffs' role to be, to the group, Laurel replied and said that this is what Plaintiff is supposed to be doing. The email continued, Laurel Anderson was removed, Plaintiff added her back on and asked for clarification again, as Richey was trying to indicate what she perceived Plaintiffs' role to be. This caused a meeting to be set up between Laurel Richey, Amanda Putfall-Nowack ("Amanda") (Matts' boss), Matt & Plaintiff.  During this meeting, Laurel started by indicating that if there are any issues, that it stays within the product team. Others outside of the product team should not be aware of our issues. Plaintiff took this to mean Plaintiff had violated this because Plaintiff sent the email to Downard and Harris. Plaintiff did so because Plaintiff was working with these two mainly and needed to understand what Plaintiff was supposed to be doing.  Richey and Amanda (Plaintiff believes), had created a table that outlined his  responsibilities, Plaintiffs' responsibilities, and our responsibilities. Plaintiff noticed a shift in the tone and energy from Laurel and Richey after this point.

67.     Plaintiff had been through so much the second week that the issues even brought Ms. Grays to tears while in a meeting with Richey, where Richey was discussing the issues. Plaintiff questioned why Plaintiff was brought into this role, Ms. Grays felt that she was being set up to fail. Plaintiff decided that Plaintiff didn't want to give up so Plaintiff decided to try and build the bridge with everyone. Unbeknownst to Ms. Grays, the team in Virginia did not even know of Plaintiffs' existence, what Plaintiffs' role did or that Plaintiff was coming on board. This caused the conflict between the Virginia management and Plaintiff, as Plaintiff was unaware that they were unaware of Ms. Grays. Plaintiff sent an email apologizing if they felt that Plaintiff overstepped it was never Plaintiffs' intent and not Plaintiffs' goal is to make things better.

Plaintiff also apologized to Plaintiffs' engineering team and just said let's start over and was able to do so with both the Virginia team and Plaintiffs' development team. Plaintiff thought things were going to be okay.

68.     Over the course of weeks 3 & 4, the issues surrounding Matt and Plaintiff continued to grow.  Plaintiff made several attempts to communicate with Matt to figure things out with Matt and each attempt failed. Matt was unresponsive and removed from what was happening with the product. During this time Plaintiff also began working closely with Harris and setting up the trip to Virginia.  This trip was a necessary, entitled "all hands on deck," as there were large gaps in every area of this product.. During this 3 day meeting in VA, Plaintiff began to get more and more concerned with the lack of awareness and input that Matt had regarding the product. Plaintiff asked DV,  after a meeting can Plaintiff have with Matt if he observed the same concerns as Plaintiff. He confirmed and also suggested that we give Matt more time. Plaintiff found his inaction incorrect as the critical state of the product did not allow for slow advancement.

69.     After the three days spent in Virginia, Plaintiff asked Downard, via Slack, his opinion on the lack of input Matt provided during the session. During the three days Matt provided input only three times, about once per day. He also failed to take ownership of writing epics, which was clearly outlined in the table provided to us by upper management outlining our roles independently and together. When he did not step up after repeatedly being asked who was going to do epics, Plaintiff asked him " Matt, isn't that something you were supposed to be doing?" He replied "yes, Plaintiff will do those." It wasn't until Plaintiff asked him that he accepted which was really baffling to Ms. Grays as it was clearly indicated on the table provided by management that this was his responsibility. This along with the lack of input caused great concern for Ms. Grays as Harris, was temporarily assigned by the CEO and Matt was supposed to take over his role. The possible repercussions of not having someone qualified in that position would cause great harm to everyone involved in the product, as well as the product itself. Plaintiff asked Downard for his opinion on Matt and if he shared the same concerns as Plaintiff.  Downard became very defensive of Matt, indicated that he and Matt had a former working relationship and contributed his lack of input to his quiet demeanor. After this conversation the tone changed between Downard and Plaintiff.

70.     During Plaintiffs' meetings with Richey, Richey continued to ask Ms. Grays about Plaintiffs' working relationship with Matt. Plaintiff advised her on several occasions that Plaintiff do not get any feedback, Plaintiff cannot go to Matt for any information and Matt is not involved in the product. She advised Ms. Grays to continue working on communicating with him, which Plaintiff did. During a  payment processing issue Plaintiff had sent out an email to people who needed to know and a separate email to those who may have to communicate with customers. The email Plaintiff sent to those who needed to know was forwarded by Downard to Amanda. Amanda forwarded the email to Matt, Richey and Plaintiff,  indicating that she wanted to make sure Matt was aware, implying he was unaware as wasn't on the email she received. Plaintiff replied and said he is aware and he was sent to separate email, along with two others who would possibly need to communicate with customers. Amanda replies to Ms. Grays alone

and apologizes and says that she just wanted to help him see where he could get in and help. By this time Plaintiff had been asked about Matt several different times and have not received any new actions from him nor were any of Plaintiffs' attempts successful. Plaintiff replied to Amanda's apology and re-added Richey and Matt. Plaintiff outlined that the underlying tone of this email relates to the perception that Plaintiff is preventing, blocking and/or stopping Matt from doing his job. Plaintiff provided examples to support Plaintiffs' areas of concern including what occurred in Virginia. Amanda replied to Ms. Grays and asked that her and Plaintiff have a conversation. During the conversation with Amanda she outlined how she believed Matt and Plaintiff could have a great working relationship, that he performs well on his other product and that he's just quiet.  Plaintiff advised her that we never really had a chance to talk and reset and that Plaintiff would set that meeting. Before Plaintiff could get that meeting set up Plaintiff was confronted again with the Matt situation by Richey. And no point in time did she ever acknowledge what he could be doing better. At no point did Amanda acknowledge what he could be doing better. All of the issues were on the Plaintiff to solve.

71.     Plaintiff set the meeting up with Matt. We began the meeting by determining what the goal of the meeting is for each of us. Plaintiff described her goal in detail, Matt only offers, the "same as yours." Plaintiff began outlining what Plaintiffs' areas of concerns were and what Plaintiff needed from him. He began advising Ms. Grays that he needed to be included and needed information. Plaintiff asked several times "[w]hy you're saying this?" Ms. Grays provided all information to Matt and has included Matt on everything you should be included on. Why there's a perception that Ms. Grays was not giving Matt things that he needs." Matt said it wasn't that Plaintiff wasn't doing it, it's just that it's what he needs. Plaintiff said "well this meeting is to discuss what we're not getting from each other, so that we can improve our working relationship." Matt had no requests of Ms. Grays and Plaintiff advised him at the end of the meeting that Plaintiff felt that nothing has been accomplished and we were in the exact same place we had been before. Plaintiff also advised that everyone on this product, is unclear on his role, responsibilities. He asked Ms. Grays who, Plaintiff said everyone.

72.     Immediately following Plaintiffs' meeting with Matt, Plaintiff had a meeting with Richey. Plaintiff informed Richey that Plaintiff felt that there was still no actions determined that Plaintiff could take to make this better. During this conversation Plaintiff determined what the real issue, which was, there multiple product managers on this product. This causes a disconnect in the expected collaboration management wanted to see, as Plaintiff did not have to talk to Matt nor can Plaintiff get the information needed from him. Which again points to the fact that this product will not function as others do. This was an aha moment for both Richey and Plaintiff. Plaintiff spoke with Matt about this and he and Plaintiff concluded that this was going to be this way as all these other people are involved and he will not be able to do this by himself.

73.     As Matt and Plaintiff were unable to achieve the desired working relationship from Management's point of view, Richey set up an example meeting with another product owner/product manager team.  Prior to this meeting Plaintiff outlined to Richey, several times, that this product along with the roles will not fit into the typical makeup of other products. This

is due to a lack of fundamental pieces required for the product to function in such a manner. She acknowledged what Plaintiff said but didn't understand because she is not on the product nor has ever been. She did not understand what was wrong nor did she have a way to fix it. During this meeting, the product owner and product manager talked about who does what and why and how it works great for them. Plaintiff said nothing during the whole meeting until everyone else stop talking and everyone was sitting there for 20 seconds waiting for someone to say something, Ms. Grays.

74.    Plaintiff advised that this is great, but it is not available for us to do at this point because we are missing many key elements and we are dealing with issues that other products do not. This sparked the conversation between Richey and Amanda and Plaintiff as they continue to try and negate Plaintiffs' statement that this product cannot fit in this model at this time. As all continued to discuss, it became apparent that the other product on our product manager team were no longer needed and they dropped off. Richey and Amanda gave the suggestion that Matt should be cleaning up the backlog. Plaintiff advise them that he had been invited to the backlog clean-up meetings and he does not show up. These meetings were set early in the morning at 8 a.m. mountain time because the team in Virginia is 2 hours ahead and those are the people who know what needs to be done. As Plaintiff is in mountain time and Matt is on Pacific Time this creates a challenge for all of us to determine a time.  Amanda offered her team's way of resolving this issue, by rotating the meeting time. This could be done, however, we just began doing these meetings and Matt does not attend. Nor has he ever stated he is not attending because of the time.

75.    The discussion continued and reference that Plaintiff need to be sending things Matt's way. Plaintiff pull up a list of items that Plaintiff had asked Matt to look into and provide answers or feedback on, a Google Sheet. When Plaintiff went in to verify same sheet which Matt failed to update, Matt was in the sheet at the same time. This indicated he understood where the conversation was going, that he knew where to access and was aware Plaintiff was waiting on responses. Amanda and Richey were unaware of this and Plaintiff never revealed this to them. Multiple attempts were made and he did not reply one time. Plaintiff brought up the list to show that Plaintiff was making good-faith efforts, trying to work with Matt and that he is not responding. When Plaintiff brought this up Richey and Amanda asked Ms. Grays to send them the list of items. they continue to insist that Plaintiff needed to do something to improve the working relationship between Matt and Plaintiff. At no point did Matt take any ownership of his part of our issues, nor the fact that he ignored request after request, for information. Plaintiff brought this up at which time he then apologized. Plaintiff brought up the fact that Plaintiff really have five product managers to deal with. Richey and Amanda proceeded to tell Ms. Grays that Plaintiff needed to put everything through Matt, so that he can get up to speed. As Ms. Grays going around Matt would not allow him to get up to speed. Plaintiff advise them that multiple people on this product would have a problem with that and that if they wanted to do that Plaintiff am fine. Plaintiff just needed them to inform everyone on the product that this is what would be happening.  They asked who Plaintiff was referring to so Plaintiff named the team in Virginia, the development team, Chris Downard and Nick Harris. They advised that they would speak with Harris and follow up with Ms. Grays. The call ended and Plaintiff sent Amanda and Richey the list of items.  No one ever responded to Plaintiffs' email. Immediately after this meeting, Matt

15

began responding to the items Plaintiff had requested information on weeks ago. After this meeting there was no more talk about the working relationship between Matt and Plaintiff from Richey.  Matt continued to remain and unknown aspect of this product to multiple people involved.

76.    After the meeting in which Plaintiffs' role was outlined by the management team, Richey immediately sent Ms. Grays a 30 - 60 - 90 day outline. On the list she made it marks two things that were unattainable with the current status of Plaintiffs' product. At Plaintiffs' 30-day review, Plaintiff superseded expectations and those that were not attained, were not attained due to items outside of Plaintiffs' control. There were only positive remarks for Plaintiffs' 30-day review.

77.    Richey came to visit again, the beginning of March. She sat in on one of the meetings Plaintiff was conducting with the engineering team. She provided no feedback.

78.    On March 5th or March 6th 2018 in passing, Plaintiff overheard Harris instruct Downard to send of communication out to everyone working on this product asking to go to lunch. This was being done as there are a lot of issues, and it's going to be a lot of work, and it's going to be not fun. This lunch was meant to thank and encourage the team. Downard failed to send the message out. Plaintiff received a email and a slack from Downard on March 8th at 2:30 p.m. He  begins stating that both him and Harris suck because they are sending this out late but that there is a product lunch tomorrow. Plaintiff asked him was this for everyone? He says yes. Plaintiff asked if we can we reschedule as this is last minute and some may not be able to attend. Downard then notifies Ms. Grays that everyone is able to go and he who he has spoken with. Plaintiff, the product owner, was the last person he asked, which demonstrates his treatment of Ms. Grays. Downard admittedly notified other teams the on March 7th but waited to notify Ms. Grays until March 8th at 2:30 p.m. He also knows that Plaintiff works from home on Fridays. Plaintiff believes this wasn't intentional act on his part in retaliation for Plaintiffs' observations of Matt, so he wanted to exclude Ms. Grays. Plaintiff advised him that this was poor communication and this is something that has plagued this product and we are trying to change it. This needs to be communicated in every facet. He replies indicating that Plaintiff am blowing this out of proportion and trying to turn this into something it's not. Plaintiff disagrees. He says that he will let Plaintiffs' thoughts be known. Plaintiff advised that Plaintiff will do so directly and that was the end of that conversation.

79.    Plaintiff then drafted an email to Harris to outline Plaintiffs' concerns, which were as follows;  "[t]hat we need to communicate properly as we are trying to change the type of communication on this product. Things not being communicated in timely manners when trying to thank the team but everybody doesn't have a chance to participate does not communicate the right message. Lastly, that we have a lot of deadlines, a lot of work and that the team time needs to be accounted for properly. Adding that Plaintiff should be addressed prior to planning anything so that we can make sure things happen at the appropriate times." Harris replies almost immediately, adds Downard onto the email, and says that he never intended any harm and we can reschedule. Plaintiff replies stating rescheduling not needed, as Plaintiff would have liked to have attended but since everyone has already scheduled their time that we just move forward and

just do better next time. Plaintiff did not receive a response back that day. The next day Plaintiff followed up and asked the way we wish to communicate. Harris replies and completely agrees that ended the conversation.

80.     When Plaintiff started Downard advised Ms. Grays to let him know when to back off if he was overstepping. Plaintiff had witnessed him several times asking Ms. Grays and others why they were coming to Ms. Grays with certain things or why Plaintiff was doing certain things. This was overstepping his role as he had nothing to do with what Plaintiff do on a day-to-day basis. Plaintiff politely asked him to back off. That Plaintiff understood Plaintiffs' role at this time and did not need his input any longer. He advised Ms. Grays that Richey had asked him to watch Ms. Grays. Plaintiff advised him that this was not his role and that this would only put him and Plaintiff into a situation we did not have to be. Richey is Plaintiffs' boss and Richey should be acting as such. At this time Downard  advised Ms. Grays that he was having difficulty because he was used to people just doing what he said and Plaintiff was not in that type of relationship with him. He said he would speak to Richey. He never followed up.

81.     On March 13th Plaintiff had a 60-day review meeting set up with Richey. She begins the meeting outlining the good things that Plaintiff has done, stating that Ms. Grays is a hard worker[9], dedicated, that Plaintiff is doing a great job, the only thing is that Plaintiff have a "communication issue." Plaintiff was unaware of this communication issue as Plaintiff had not had any issues with anyone including, Matt for the past three to four weeks. All of the issues Plaintiff had with anyone at the beginning of Plaintiffs' employment were long gone and the only issue that remained was the issue between Matt and Plaintiff, as he was still ineffective in his role. While this was still an issue, it was no longer being discussed or brought up after the last meeting where Plaintiff showed that he was not responding. Plaintiff was confused as to how this is being stated as an issue. Plaintiff asked for specific examples. Richey brought up the email that Plaintiff sent to Harris, in regards to lunch. Plaintiff knew immediately that Downard had sent Richey this email, further proof of the conspiracy, and improper supervision Downard was enacting against the Plaintiff. Ms. Grays knew this because Harris clearly did not have a problem as he apologized to Ms. Grays. So how could the executive had no problem with, now be construed as a communication issue, in Plaintiffs' boss's point of view? After Plaintiff made several statements about Downard sending her the email, Richey indicated that Harris sent her the email. Plaintiff believed this to be untrue when she told Ms. Grays, but have confirmed since Plaintiffs' termination that this is a lie. Plaintiff emailed Harris after Plaintiffs' termination and he indicates he has no problem with the email.   Plaintiff told Richey that Plaintiff stand behind everything that Plaintiff wrote in the email and if she could specifically point out what in the email was unprofessional, too controlling or the issue.  She regurgitates Plaintiffs' email and indicates the issue is the fact that Plaintiff used bullet points. Plaintiff asked Richey, "[s]o the issue is using bullet points?" She replies well not just that. Plaintiff said okay will do you have another example? She replies she does and points to the email Plaintiff sent Amanda after Amanda forwarded the email to Richey, trying to point out something Plaintiff did not do. Plaintiff advised Richey that Plaintiff stood behind that email as well. Plaintiff asked Richey if she could write up what Plaintiff should have said and why what Plaintiff said was incorrect.

82.     Richey said she would do that. Richey attempted to get off the phone before even continuing with the review and Plaintiff asked her to continue. As she started going through the 60-day items Plaintiff noticed she had called out several items that were not on Plaintiffs' list. She admits that she failed to send Ms. Grays the updated list. Yet she wanted to hold Ms. Grays to a standard she never provided. The tone of the meeting clear, so Plaintiff send a follow-up email to document what was discussed in the meeting. Richey never responds.

83.     On March 15th Richey scheduled an impromptu meeting with Ms. Grays. At which time she indicated she will not be doing a write-up to show Ms. Grays where Plaintiffs' communication is wrong. Richey wants Ms. Grays to take ownership and figure out where Plaintiffs' communication needs to improve. Plaintiff advised her that Plaintiff did not see anything wrong in the communication and therefore am unclear on how to improve. Plaintiff need her to show Ms. Grays where the issue is. Richey began to say that it seems like Plaintiff don't see a problem and this was a problem. Plaintiff advised Richey that Plaintiff is willing to fix the problem if Plaintiff know where the problem is. Plaintiff don't know where it is. What did Plaintiff say that was controlling or wrong? She advises she will not show Ms. Grays where the issue is. Plaintiff advise you're setting Ms. Grays up for failure and will have to contact HR, as Richey was treating her unfairly, refusing to help improve and discriminating against her. Richey advises she already has contacted HR

84.     Plaintiff attempts to resolve [sic] communication issues by redrafting and sending an updated version of the communication issue to Richey. Richey replies to Ms. Grays the next day and says that we will discuss more on Tuesday and sends Ms. Grays the table referencing Matt's duties and Plaintiffs' duties. Plaintiff found this to be confusing as Plaintiffs' communication with Matt was never brought up as a reference to Plaintiffs' communication issue.

85.     On March 20th Plaintiff has a standing meeting with Richey. That usually takes place via a phone call on slack. Plaintiff attempted to call her she did not answer and replies to use this link. Plaintiff joined the link Jaidyn from HR is in the virtual conference room and they advised Ms. Grays that Plaintiff is terminated and begin to go over the severance letter that they emailed to Ms. Grays. At no point did either Jaidyn or Richey say why Plaintiff was being terminated. As Plaintiff was ending the call, Plaintiff had asked for a written explanation as to why Plaintiff was being terminated. Plaintiff went out and informed Plaintiffs' team that Plaintiff had just been fired. a couple of them thought Plaintiff was joking. They all could not understand why Plaintiff was getting fired. They all gave Ms. Grays a hug, six team members, and Plaintiff said Plaintiffs' goodbyes. Upon Ms. Grays gathering her items and walking out, Downard decides to follow Ms. Grays in the elevator Lobby and says to  "[I] tried to fight for you." Plaintiff don't respond and exits the building. Plaintiff informed Elena  located in Virginia that Plaintiff was fired and she also was taken back as Plaintiff was doing a lot of work that was needed. "They had been waiting for someone like Ms. Grays for years."

86.     The fact that Plaintiffs' entire team who was present in the office that day, gave Ms. Grays a hug, shows the level of professional productive relationships Plaintiff was able to build. Not only with Plaintiffs' development team but Harris an executive Elena Keck who has been

employed with the company for 10 years. Communication issues where abundant in the company, especially with people who worked on this product. The fact that Plaintiffs' communication issues were pointed out and used as a point to move someone's agenda to remove Ms. Grays from the company, shows that Plaintiff was being targeted and discriminated against. Plaintiff was being held to a higher standard than all other counterparts, whom were all Caucasian. Dow, and had an agenda to get Ms. Grays removed and played a critical role in Plaintiffs' removal.

**Employee File Discrepancies**

87.      Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference. The Plaintiff received the employee file twelve calendar days after her initial request. While it is not required for companies to maintain employee files or maintain them in certain formats, a company this size, in the government software industry, one would typically expect to have better standards for records. A normal request such as to see the contents of a digital employee file, one whom has only been employed for eleven weeks, would not take nearly two weeks to remit.

88.      The Plaintiff offers her opinion as an expert, as she has been in Information Technology for twelve years and worked for companies, in the Information Technology department(s), triple the size of Granicus. It is possible that other actions were being performed as to why Granicus was slow to provide the Plaintiff her employee file. Almost all files contained within the employee file, are digital documents, which at most, should have taken three business days to "pull[ing] together," according to Carrie.

89.      The employee file contains a total of ninety-two pages, six pages are the Granicus, Inc. Acceptable Use Policy, dated January 11,2017. Pages seven through eleven are compensation and benefit information for the plaintiff, with a print date of one day before the file was given to the plaintiff, 04/05/2018. The next fifty-eight pages are the Granicus, Inc. Employee Handbook, dated November 8, 2017.

90.      All the next three pages are an anomaly when compared to all the other documents in the file. These three pages, seventy-one through seventy-three, do match other documents in the file due to one or more of the following; (1) not printed from an application; (2) not printed from a report; (3) not pre-printed, (4) does not contain a date and (5) does not contain handwriting. As the linear fashion of the documents suggests, these documents were scanned after the handbook and before the next document offer letter.

91.      These three anomaly pages are the specific documents in question, to which Carrie Cisek refused to validate multiple times, the date of creation and the date of addition to the plaintiffs' employee file.

92.     Pages seventy-four through seventy-eight are the plaintiffs' offer letter and three-page ERCA she scanned and sent to Sean. The format of these pages is quite larger than all the other pages, indicating these pages came from a different computer or format.

93.     Pages seventy-nine through eighty-one are printouts from the payroll system, UltiPro. Page eighty-two is blank, it is unclear why this unnecessary page was added to the file. Possibly, someone rushing putting the file together. Pages eighty-three through eighty-five are more UltiPro benefits printouts.

94.     The next five pages offer an additional glimpse into the operational standards allowed at Granicus. The plaintiff requested her employee file on 03/26/2018. Carrie Cisek emailed the plaintiff her file at 16:31 MDT on 04/06/2018. The timestamp on the bottom of these pages indicate someone on the East coast or with the clock on their computer a couple hours off, printed, scanned and added these documents to the plaintiffs 'employee file, hours, possibly just minutes, before the file was sent to the plaintiff. These were added just before the last two pages of the file, the W4.

95.     In total, sixteen pages of the employee file have a time/date stamp of either 04/05/2018 or 04/06/2018. Five more are again the offer letter and three-page ERCA. Barring the one blank page, all of the other sixty-seven pages or seventy-three percent of the employee file was created in 2017, before the plaintiff started her employment.

96.     Eighteen percent of the documents were printed the day before or day of sending. Seven percent of the file is the offer letter, ERCA and the blank page. This equates to ninety-two percent of the file existing prior to the plaintiff's request. All the ninety-two percent, were either, (1) only requiring printing from an application or (2) a document that existed prior to request, in digital form. Resulting in questions surrounding the extended amount of time to remit.

97.     Only the three anomaly pages are unaccounted for, or as must be what Carrie was referring to when stating "[p]ull[ing] together," and therefore, must account for the extended period amount of time Granicus took to provide the plaintiff documentation that already existed, and should have been contained within her employee file.

98.     Considering the defendant terminated the plaintiff's employment for what was described post termination, per Jaidyn as, "[c]onsistently not [meeting] met expectations." There is no documentation of the alleged consistent failures within the employee file. Had they been documented, providing the file to the plaintiff would have or could have been timelier.

99.     The handling of the employee file, by Carrie Cisek, has caused the plaintiff to question the validity and accuracy of the contents of the file. The refusal of the VP of HR, to validate multiple times, the dates of document creation and addition, ones of great importance, as these were used to determine termination, cannot be ignored. An added point of reference into the standards practiced and accepted at Granicus.

## Claims for Relief

100.    Plaintiff re-alleges the preceding paragraphs set forth above and incorporate them herein by reference, *inter alia*:

**Claim One Supporting Facts**

101̶0̶.    Section 706(e) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5(e)(2)) is amended--

> `(2) For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this title (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.'.

10̶1̶2.    Violations of 42 USC 2000e-2

42 USC 2000e-2 states, (a) "[E]mployer practices

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;"

1.1. discharged due to race, color and sex

1. Discharge was a surprise for the Plaintiff and many members of the development team.

2. Discharge occurs seven days after negative review, without providing an opportunity for improvement.

3. Plaintiff received no documentation of all the [sic] failures or [sic] issues within the employee file or during her employment, except for the 60-day review.

4. Carrie Cisek admits the 60-day review was used to make termination decision.

5. Plaintiff witnessed on multiple occasions a willful intent to ignore many instances of unprofessional conduct. Example William Jones in interrupting meetings, unwillingness to participate in actions designed to improve team cohesiveness. Plaintiff was informed that this same behavior is exhibited by others on other teams, and that "they ignore" it.

6. Downard failed to address multiple issues of other white male counterparts. He forwarded Jess this email because Plaintiff I pointed out something he didn't do correctly, to an executive. Chris disliked my ability to communicate with the executive and that Plaintiff had pointed out something he had done incorrectly.

7. Another example is Matt McFarland. He was the product manager however multiple people failed to understand what his role was and acknowledge that he was highly uninvolved in many aspects of the product. His behavior was tolerated and was translated to be in an efficiency on Plaintiffs' my end.

8. Any complaint that was brought to the attention of management from a white male counterpart was taken as true. It was not investigated and IPlaintiff was automatically determined to be wrong. This happened with the unprofessional conduct in multiple meetings by William Jones. When Brian Bolig complained about my slack communication. When Matt McFarland complained about me blocking him and when Chris Downard forwarded Jess Richey the lunch email Plaintiff sent to NickHarris. Each of these complaints were initiated by a white male, and Jess Richey never asked my side of the story, before coming to conclusion that Plaintiff needed to do something fix it. Plaintiff brought this to Jess's Richey's attention as well.

1.2. Changed employment terms due to race, color and sex

1. Added the term of "[t]raining period upon termination." by Jaidyn Martin.

2. Added supervision by Chris Downard, as expressed in emails, and in the email used to authenticate the Plaintiffs' [sic] "[c]ommunication issue."

3. Defendants' actions regarding the contract or ERCA, displays a disregard for the value of the document. Several people at several different points failed to notice glaring inadequacies on each page. Not until after the termination of the plaintiff did someone notice she had not agreed to their terms.

4. Product Manager responsibilities were placed on the Plaintiff.

1.3. Changed employment privileges

1. Plaintiff was not allowed to lead the development team as originally stated in the job description[4].

2. Plaintiff was not allowed to perform Product Owner duties as outlined in the job description[4].

3. Unable to message development as desired in private channel.

3.

1.4. Changed reason for termination six times after termination

1. 04/23/18: Reasons for Termination - (Thomas Carroll (ex-counsel))

"[S]he demonstrated an inability to understand the company's priorities as communicated to her; an inability to build and maintain internal relationships; and an inability to receive feedback and act on it."

2. 04/20/18: Reasons for Termination- Provided to Colorado Department of Unemployment

"[S]he could not encourage her team to perform well, she could not develop and maintain professional communication relationships, not meeting expectations."

3. 04/16/18: Reasons for Termination - (Sara DeTuncq HRIS & Payroll Specialist) Provided to Colorado Department of Unemployment

"Ms. Grays began working at Granicus in 2015. She quit on 3/20/2018."

4. 04/06/18: Reasons for Termination - (Carrie Cisek, VP of HR)

"Ms. Grays also included the 30 & 60 day milestone documents[8] since that information was used to determine your termination."

(NOTE: This alone directly conflicts Defendants originally stated termination reason on 4/23, as the 60 day review[9] showed Ms. Grays made progress in many of the areas listed, thus, she acted on several items. Also, this is the document that was used for decision, yet an updated list of items was never provided to Plaintiffs' client prior to the review. This questionable document contains multiple mistakes and verifies the consistent unprofessional conduct of many personnel at Granicus. Ms. Cisek was asked several times to verify the date the 60-day review document was created and added to Ms. Grays' employee file, she refused to provide an answer, multiple times.)

5. 03/20/18: Reason for Termination - (Jaidyn Martin, HR Manager) Post Termination

"Your performance has consistently not met the expectations established during this training period and there continues to be a lack of growth in the role. You have consistently demonstrated an inability

to create professional and productive working relationships that are essential to be successful in the role. We have strong concerns that these gaps will continue to grow and therefore have determined that it is best to discontinue your employment effective today."

6. 03/20/18: Reason for Termination - (Jessica Richey, Program Manager & Jaidyn Martin, HR Manager) During Termination

*No reason provided*

---

[8] Exhibit 8
[9] Exhibit 9

1.5 Non-African-American employees treated differently, including infractions of higher negative impact on entire business.

1. All Granicus employees in the HR department involved in this claim, did not hold to their end of their agreements with Granicus. Granicus has yet to hold these non-African-American employees responsible for their failures, a sign the level of regard Granicus has for its own ERCA is meek and evidence of the disparate treatment.

---

[8] Exhibit 8
[9] Exhibit 9

4.2. Plaintiff was not provided the review document at the 30-day review, not allowing her to understand the review process or the [sic] merit system, disparate impact.

1.6  (d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

1. Failed to train Ms. Grays after poor review. Review provided no steps to a successful outcome.

2. Richey failed to provide the review document to the Plaintiff at 30-day review.

3. Richey failed to provide the examples of how the communication in emails could have been changed to communicate [sic] properly, even after originally promising the Plaintiff she would.

1.7 (h) "[S]eniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29 *[section 6(d) of the Labor Standards Act of 1938, as amended]*."

1. 60-day review documents not used with other employees

2. Fails to meet bona fide criteria

3. Disparate impact to African-Americans

4. Practiced Different privileges and terms of employment, as the merit system is not bona fide (e-2 (h).

5. Richey failed to provide the review document to the Plaintiff at 30-day review.

1032. Violations of 42 U.S.C. 2000e-3. *[Section 704]*

42 U.S.C. 2000e-3 states,

1. (a) "[D]iscrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on—the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any

member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

1.1 temporal proximity of three days after stating unfair treatment discrimination and going to HR, is sufficient to support a prima facie case of retaliation.

1.2 The Commission states, " EEO complaints made internally (e.g., to a company manager or human resources department) as "opposition,"[25] the Supreme Court in Crawford v. Metropolitan Government of Nashville & Davidson County explicitly left open the question of whether internal EEO complaints might be considered "participation" as well.[26] The Commission and the Solicitor General have long taken the view that participation and opposition have some overlap, in that raising complaints, serving as a voluntary or involuntary witness, or otherwise participating in an employer's internal complaint or investigation process, whether before or after an EEOC or Fair Employment Practices Agency (FEPA) charge has been filed, is covered under the broad protections of the participation clause.." As both you and Ms. Richey confirm, Plaintiffs' client told her she was going to HR. You are just contesting the reason Ms. Grays made the statement, which, we have documented evidence to support, Ms. Grays' version, not Granicus'. Additionally, "The Commission has long taken the position that the participation clause broadly protects EEO participation regardless of whether an individual has a reasonable, good faith belief that the underlying allegations are, or could become, unlawful conduct."

2. (m) "[I]mpermissible consideration of race, color, religion, sex, or national origin in employment practices

~~2.1~~  Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

~~2.1~~2.1 Considered race when making termination decision

~~1.3~~2.2 Considered sex when establishing employment practice of ignoring Caucasian males improper actions, while focusing and exaggerating the African-American females minor errors.

~~1.4~~2.3 Considered race when failing to address Caucasian female employees' major infraction

~~1.5~~2.4 Considered race and color when failing to offer training

26

1.62.5 Considered race when deciding to hire Ms. Grays

1.72.6 Considered race when allowing Caucasian male counterparts to complain about insignificant concerns and then turning those major issues of employment.

1.82.7 Considers race and color in hiring decisions and practices, as the Plaintiff is the only African-American to be directly hired and work full-time in, the Denver, Colorado office, located at 707 17th St, since 2017.

2.8 Considers race and color in hiring decisions and practices, as the Plaintiff is the only African-American to be directly hired at her position level or higher within the company, since 2015.

**Claim Two Supporting Facts**

10<del>43</del>.   Violation of 42 USC 1985(3)

1. 42 USC 1985(3) states, "[D]epriving persons of rights or privileges If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

2.1.Richey and Downard conspired to deprive Ms. Grays of Plaintiffs' right to equal employment as the email used to reference [sic] poor communication, at the 60-day review, was verified as sent to Richey. Harris admitted failing to provide the email. Proof of the cover-up of Richey, stating Downard did not send the email to her.

2.  Jaidyn Martin further conspired with Richey pri<del>oroper</del> to Plaintiffs' termination, as indicated by Richey notifying the Plaintiff she had already contacted HR. Proving a plan was already in place to terminate without documentation or cause, conspiracy to deprive the Plaintiff of the right to equal employment.

3.

## Claim Three Supporting Facts

10~~5~~4. Violations of 42 USC 1981

~~1.~~ 42 USC 1981 states,

(a)"[S]TATEMENT OF EQUAL RIGHTS
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b)"MAKE AND ENFORCE CONTRACTS" DEFINED
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c)PROTECTION AGAINST IMPAIRMENT
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

1. By and through the preceding paragraphs, Plaintiff has established Defendants have violated this law.
2. Damages Pursuant to SEC. 1977A The Civil Rights Act of 1991 .

2.

## Claim Four~~Three~~ Supporting Facts: Wrongful Termination

10~~7~~5. Defendants have provided no documentation of all the [sic] issues.

10~~8~~6. The 60-day review document[9] shows the inconsistency in statements and assessment as items which should be orange as they were noted to be in progress, were marked red. Plaintiff only learned what the key meant by contact HR, as it is not on this review sheet Granicus claims to use with all employees.

10~~9~~7. By and through the preceding paragraphs, Plaintiff has established Defendants failed to terminate for reason(s) stated, proving ill intent and absent legal reason for termination.

## Claim Five~~Four~~ Supporting Facts: Outrageous Conduct

11008. At minimum, three HR employees had contact with the ERCA and failed to notice the absence of signatures, both the defendants' and plaintiffs,' negligent in their duty. Their negligence causing the need for this suit being brought before the Court, put their company Granicus, at extraordinary risk and caused great harm to the emotional wellbeing of the plaintiff. All of whom are non-African-American and whom are still employed.

11109. Granicus's outrageous conduct, attempting to change the ERCA, only because the plaintiff requested her employee file, in pursuit of the law; due process, is nothing less than outrageous. This willful conduct causing great emotional distress upon the plaintiff after the defendants terminated her employment.

1120. By and through the preceding paragraphs, Plaintiff has established Defendants conduct is nothing less than outrageous.


**Claim SixFour Supporting Facts: Breach of Contract Promissory Estoppel**

1131. The promise Richey made to Plaintiff at the 60-dey review meeting and two days after, if Plaintiff corrected communication, all would be okay. Plaintiff believed acted on the promises, as indicating with the re-write.

1142. By and through the preceding paragraphs, Plaintiff has established Defendant made promise and failed to perform causing the unjust termination of the Plaintiff providing direct injury to the Plaintiff.


**Claim SevenFour Supporting Facts: Blacklisting**

1153. Plaintiff has not been able to find work and receives very few calls due to DefendantsPlaintiffs' actions and words. Plaintiff has filed a retaliation complaint with EEOC, currently under EEOC jurisdiction as they have filed the charge on Vertafore, a sister company of Granicus, under the Vista Equity Partners umbrella.

1146. Plaintiff has been out of work for six months, applied to over one hundred and sixty jobs, has only had three interviews.

117. By and through the conduct described in Claim Eight, Defendants have also performed actions to constitute blacklisting.


**Claim Eight Supporting Facts: Slander**

118. Defendant Granicus LLC, published defamatory statements and caused statements to be published which caused the Plaintiffs' actual and special damages.

119. Defendants held notice and had reason to believe that the statements regarding the Plaintiffs' employment, and conduct were false. Defendants at the time of publication knew

the statements were false and/or stated them with reckless disregard for the Plaintiff and the factual basis for those statements.

**Claim Nine Supporting Facts: Breach of Fiduciary Duty**

120.    Defendant Jessica Richey was acting as a fiduciary of the Plaintiff, with respect to the Plaintiffs' position and employment at Granicus, LLC.

121.    Defendant Jessica Richey breached her duty to the Plaintiff, by and through the preceding paragraphs, which caused the Plaintiffs' damages and losses sustained through the actions described.